[Civ. No. 43478. First Dist., Div. One. Apr. 13, 1979.]

MARGARET TINSLEY et al., Plaintiffs and Appellants, v.
PALO ALTO UNIFIED SCHOOL DISTRICT,
Defendant and Appellant;
THE STATE OF CALIFORNIA et al., Defendants and Respondents.

874

COUNSEL

Sidney L. Berlin, Elaine Berlin White, Berlin & Goodman, Cotchett, Hutchinson & Dyer, Joseph Cotchett, Susan Illston, Keogh, Marer & Flicker, Gerald Z. Marer, Nathaniel Colley and Nancy Reardan for Plaintiffs and Appellants.

Fred Okrand, Mark D. Rosenbaum, Mary Ellen Gale, Shockley, Duff & Hart-Nibbrig, Joseph Duff, Manning, Reynolds & Roberts, Virgil Roberts, Lynn Pineda, Halvor T. Miller, Thomas G. Neusom, Edward M.

Medvene, Alan Schlosser, Margaret Crosby and Amitai Schwartz as Amici Curiae on behalf of Plaintiffs and Appellants.

Breon, Galgani & Godino and Margaret E. O'Donnell for Defendant and Appellant.

Selby Brown, Jr., County Counsel, Robert T. Owens, Assistant County Counsel, Keith C. Sorenson, District Attorney, George F. Camerlengo, Deputy District Attorney, Rosen, Remcho & Henderson, Sanford Jay Rosen, Thelton E. Henderson, LaDoris Hazzard Cordell, Breon, Galgani & Godino and Keith V. Breon for Defendants and Respondents.

## OPINION

SIMS, J.*—Petitioners, the parents of elementary school children in various elementary school districts within the territory embraced within the boundaries of Sequoia Union High School District and in Palo Alto Unified School District, seek a writ of mandate to compel the respondent elementary districts and others to submit to the court a reasonably feasible plan to eliminate or alleviate alleged racially segregated schools existing within those districts. They have appealed from a judgment entered following an order sustaining, without leave to amend, the demurrers to their second amended petition as amended by a third amendment. It appears from the pleadings that the alleged segregation of which complaint is made is interdistrict in nature, and allegedly can only be eliminated or alleviated by an interdistrict plan. The trial court ruled that the petition, as thrice amended, failed to state a cause of action because it fails to allege any intentionally segregative acts or omissions requiring interdistrict relief, and, alternatively, because it fails to allege any acts or omissions, whether intentionally segregative or not, which require interdistrict relief.

The issue as so framed has been resolved in accordance with the position of respondents under the equal protection clause of the Fourteenth Amendment of the United States Constitution as construed in *Milliken* v. *Bradley* (1974) 418 U.S. 717 [41 L.Ed.2d 1069, 94 S.Ct. 3112]). It was left unresolved under our California Constitution in *Crawford* v. *Board of Education* (1976) 17 Cal.3d 280 (see p. 303, fn. 14) [130 Cal.Rptr.

---

*Retired Associate Justice of the Court of Appeal sitting under assignment by the Chairperson of the Judicial Council.

724, 551 P.2d 28]. Preliminarily we determine that there is no merit to the contention of certain respondents that the judgment against them is not final and not appealable. We sustain the contention of another respondent that the children themselves are proper parties plaintiff, but find that defect is curable and not dispositive of the action. Finally we recognize that the rulings under the federal Constitution are neither controlling nor persuasive in the light of principles developed under the California Constitution. The judgment must be reversed and the case must be remanded for a determination, after appropriate amendment and answer, of whether there is segregation in a recognizable geographic area entitling the pupils to relief because the minority enrollment in one district within that area is so disproportionate as realistically to isolate them from other students in other districts in that area; and, if so, whether there are reasonably feasible steps to eliminate or alleviate the racial imbalance that gives rise to such state constitutionally proscribed segregation.

I

Four of the eight elementary school districts involved and the San Mateo County Committee on School District Organization jointly interposed a motion to dismiss the appeal on the ground that there is no final judgment from which an appeal may be taken. That motion was denied, but it is renewed in the brief jointly filed for those respondents and two other elementary school districts, all collectively referred to as "the San Mateo County respondents." The case remains pending against the State of California, and the California State Board of Education because of their joint return by way of answer to the second amended petition for writ of mandate.[1] The record also reflects that there is an outstanding stipulation that the Sequoia Union High School District and the San Mateo County Superintendent of Schools, originally named among the respondents in that petition, need not respond "until 30 days after the Superioi Court has decided the issue of whether a desegregation remedy will be ordered or upon 30 days notice by petitioners."

Subdivision (a) of section 904.1 of the Code of Civil Procedure provides that an appeal may be taken from a judgment, excluding, with exceptions not relevant here, any appeal from an interlocutory judgment.

[1] *Serrano* v. *Priest* (1976) 18 Cal.3d 728 [135 Cal.Rptr. 345, 557 P.2d 929] (cert. den. 432 U.S. 907 [53 L.Ed.2d 1079, 97 S.Ct. 2951]) (*Serrano II*) indicates that the joinder of the state and the state board of education, as distinguished from the Legislature and the Governor, is sufficient to properly frame and raise any alleged deficiency in existing state laws concerning the creation or maintenance of school districts. (See 18 Cal.3d at pp. 750-753.)

■ It is generally recognized that the rule which only permits an appeal from one final judgment is designed to prevent oppressive and costly piecemeal disposition and multiple appeals in a single action, and so requires that review of intermediate rulings should await the final disposition of the case. (See *Knodel* v. *Knodel* (1975) 14 Cal.3d 752, 760 [122 Cal.Rptr. 521, 537 P.2d 353], quoting from 6 Witkin, Cal. Procedure (2d ed. 1971) Appeal, § 36, p. 4050; and *Gosney* v. *State of California* (1970) 10 Cal.App.3d 921, 928-929 [89 Cal.Rptr. 390].) The San Mateo respondents acknowledge that section 579 of the Code of Civil Procedure provides as follows: "In an action against several defendants, the court may, in its discretion, render judgment against one or more of them, leaving the action to proceed against the others, whenever a several judgment is proper." ■ Under this section when there is a several judgment resolving all issues between a plaintiff and one defendant, either party may appeal from an adverse judgment, although the action remains pending between the plaintiff and other defendants. (See *Justus* v. *Atchison* (1977) 19 Cal.3d 564, 568 [139 Cal.Rptr. 97, 565 P.2d 122]; *Aetna Cas. etc. Co.* v. *Pacific Gas & Elec. Co.* (1953) 41 Cal.2d 785, 788-790 [264 P.2d 5, 41 A.L.R.2d 1037]; *Howe* v. *Key System Transit Co.* (1926) 198 Cal. 525, 528-530 [246 P. 39]; *Rocca* v. *Steinmetz* (1922) 189 Cal. 426, 428-429 [208 P. 964]; *Baxter* v. *Boege* (1916) 173 Cal. 589, 591-594 [160 P. 1072]; *National Electric Supply Co.* v. *Mount Diablo Unified School Dist.* (1960) 187 Cal.App.2d 418, 421-422 [9 Cal.Rptr. 864]; *South* v. *Wishard* (1956) 146 Cal.App.2d 276, 281-282 [303 P.2d 805]; *Stafford* v. *Yerge* (1956) 139 Cal.App.2d 851, 853-854 [294 P.2d 721]; *Huntoon* v. *Southern T. & C. Bank* (1930) 107 Cal.App. 121, 130-131 [290 P. 86]; and Witkin, *op. cit. supra,* § 42, p. 4057.)

■ Nevertheless those respondents assert that the one final judgment rule must be applied to defeat the appeal in this case because the interests of the state, a remaining defendant, and the local respondents in this case are identical both in terms of the legal issues raised and in the relief sought by the petitioners, and, therefore, the judgment in this case cannot be a complete determination of the matter. On its face this argument is inherently inconsistent with the position successfully advocated by those respondents in the lower court when they secured the order sustaining their demurrers without leave to amend and the ensuing judgment. If, as now stated, the local districts are mere agencies of the state so that any relief directed against the state will by necessity affect them, the trial court may have erred in sustaining the demurrers. On that theory the appeal should not be dismissed, but the judgment should be reversed. The premise that there are identical interests does not bear scrutiny. The local districts, as agents, may have limited powers in

interdistrict affairs, whereas the state, as set forth below, has plenary powers in all school district affairs. (Cf. part IV, below.) The legal issues are not necessarily the same. In any event, if they are, it should be so determined on this appeal and the existing judgments should be set aside if a cause of action has been stated against the local districts as agencies of the state.

Furthermore the precedents upon which those respondents rely do not support their position. In *Hohorst* v. *Hamburg-American Packet Co.* (1893) 148 U.S. 262 [37 L.Ed. 443, 13 S.Ct. 590], the court did rule that a decree dismissing one defendant who allegedly was jointly responsible for a patent infringement was not an appealable final decree. The court applied the prevailing federal rule, apparently predicated upon the English common law and applied in federal legal, equitable and admiralty matters. ■ The federal common law rule cannot control the statutes of this state.

■ In *Call* v. *Alcan Pacific Co.* (1967) 251 Cal.App.2d 442 [59 Cal.Rptr. 763], the court did entertain what appeared to be an untimely appeal from a judgment in favor of a surety which had been entered more than three months prior to the judgment in favor of the principal from which a timely appeal was perfected. The court relied upon *Nolan* v. *Smith* (1902) 137 Cal. 360 [70 P. 166], and noted: "When a lawsuit involves a single claim against principal and surety, an appellate court should not be subjected to their separate appeals." (251 Cal.App.2d at p. 449, fn. 11.) The court noted that there was no finding of any circumstance which would permit separation of the liability of the surety and principal, and adopted the position the judgment in the surety's favor was premature rather than void and only became final, and appealable, upon entry of the judgment in the principal's favor. The alleged relationship of principal and agent between the state and local district does not necessarily create a relationship of principal and surety. In *Nolan* v. *Smith, supra,* upon which the *Alcan* court relied, the court did dismiss the appeal by the claimant from a judgment dismissing the sureties, on the alleged tortfeasor's official bond. The general ruling of that case has been strictly qualified, if not overruled. In *Rocca* v. *Steinmetz, supra,* 189 Cal. 426, the court stated: "That the judgment must be final against the defendant in whose favor it is given is essential to the right of appeal. But such a judgment is final within the meaning of that term, as given in section 963. No other judgment can be entered against him, as he will go free if the case goes no further against him. *Nolan* v. *Smith, supra,* must be overruled on this point, unless it is

considered as creating a special class of cases consisting of suits on bonds of justices of the peace, which would make such cases a class by themselves. We express no opinion as to whether this is allowable or not. It is sufficient to hold that the case is not in point here." (189 Cal. at p. 428.) We agree that neither *Alcan* nor *Nolan* can govern the case here.[2] We must determine at this point whether or not appellants have stated a cause of action against the local districts.

## II

In their second amended petition, as amended by the third amendment, 18 petitioners set forth their names and allege, "They are parents of minority, elementary school age children who do, or are eligible to, attend elementary schools operated by the Ravenswood School District." There follow the names and ages of 21 children. The 16 remaining petitioners, likewise named, allegedly are residents of San Mateo County or Santa Clara County. It is stated "They are parents of non-minority elementary school age children." There follow the names of sixteen children, eight in the Menlo Park district, two in Las Lomitas district, four in the Portola Valley district and two in the Palo Alto district. It is further alleged: "Petitioners bring this action on their own behalf and on behalf of all persons similarly situated."

Throughout the proceedings respondent Palo Alto Unified School District has insisted as one ground of demurrer that petitioners have failed to allege facts showing a right to sue for the relief they seek. In its order sustaining and overruling respondents' demurrers to the petition, as revised by the third amendment, without leave to amend, the court upheld other grounds discussed below. It expressly provided "The other grounds of Demurrer by the Respondents are overruled."

(See fn. 3.) Respondent Palo Alto Unified School District has cross-appealed from that portion of the ensuing judgment which impliedly provides that petitioners have standing to sue in this matter.[3]

---

[2] *Turner* v. *Los Angeles Realty Board* (1965) 233 Cal.App.2d 755 [43 Cal.Rptr. 919], does not aid respondents' contention. It dismissed an appeal because the disposition of only one of several causes of action against the defendant-respondent had been determined. (233 Cal.App.2d at p. 758.)

[3] It would appear that where, as here, the court expressly considered and overruled another ground of demurrer, the respondent in any event would be entitled to have it considered in support of the judgment. "If the complaint is insufficient upon any ground properly specified in the demurrer, the order must be sustained, although the lower court may have considered it sufficient in that respect and may in its order have declared it defective only in some particular in which we hold it to be good. The defendant is entitled to the decision of this court on all questions presented by the demurrer and necessary to

With exceptions not pertinent here, section 367 of the Code of Civil Procedure provides: "Every action must be prosecuted in the name of the real party in interest, . . ." In *Parker* v. *Bowron* (1953) 40 Cal.2d .344 [254 P.2d 6], the court distinguished between capacity to sue and standing to sue, as follows: "Insofar as the question of capacity to sue is concerned, not having been raised by demurrer or answer, it must be deemed to have been waived and cannot now be urged upon appeal. [Citations.] However, the question of standing to sue is different from that of capacity. Incapacity is merely a, legal disability, such as infancy or insanity, which deprives a party of the right to come into court. The right to relief, on the other hand, goes to the existence of a cause of action. It is not a plea in abatement, as is lack of capacity to sue. Where the complaint states a cause of action in someone, but not in the plaintiff, a general demurrer for failure to state a cause of action will be sustained. [Citation.] This objection is not waived by failure to raise it by demurrer or answer, and may be raised at any point in the proceedings. [Citation.]" (40 Cal.2d at p. 351. See also, *Klopstock* v. *Superior Court* (1941) 17 Cal.2d 13, 17-19 [108 P.2d 906, 135 A.L.R. 318]; *Friendly Village Community Assn., Inc.* v. *Silva & Hill Constr. Co., supra,* 31 Cal.App.3d 220, 223-224 [cf. Code Civ. Proc., § 374 as added by Stats. 1976, ch. 595, § 2]; *Oakland Municipal Improvement League* v. *City of Oakland* (1972) 23 Cal.App.3d 165, 170-171 [100 Cal.Rptr. 29]; *Hart* v. *County of Los Angeles* (1968) 260 Cal.App.2d 512, 516 [67 Cal.Rptr. 242]; *McCabe* v. *Atchison, T. & S. F. R. Co.* (1914) 235 U.S. 151, 164 [59 L.Ed. 169, 175, 35 S.Ct. 69]; *Brown* v. *Board of Trustees of La Grange Ind. Sch. Dist.* (5th Cir. 1951) 187 F.2d 20, 25; and *Tyree* v. *Smith* (E.D.Tenn. 1968) 289 F.Supp. 174, 175. Cf. *Smith* v. *Wickline* (W.D.Okla. 1975) 396 F.Supp. 555, 557.)[4]

the decision made. [Citations.]" *(Burke* v. *Maguire* (1908) 154 Cal. 456, 461 [98 P. 21]. See also *Haddad* v. *McDowell* (1931) 213 Cal. 690, 691-692 [3 P.2d 550]; *Gonzales* v. *State of California* (1977) 68 Cal.App.3d 621, 627 [137 Cal.Rptr. 681]; *Friendly Village Community Assn., Inc.,* v. ·*Silva & Hill Constr. Co.* (1973) 31 Cal.App.3d 220, 224 [107 Cal.Rptr. 123, 69 A.L.R.3d 1142]; and 6 Witkin, Cal. Procedure (2d ed. 1971) Appeal, § 228(d), p. 4218. Cf. *Stowe* v. *Fritzie Hotels, Inc.* (1955) 44 Cal.2d 416, 425-426 [282 P.2d 890].)

[4]Petitioners contend that *Parker* v. *Bowron, supra,* 40 Cal.2d 344, is inapplicable to this case. The fact that it involves the question of wages in public service, as distinguished from school segregation, does not affect the procedural points for which we have cited it and on which the Palo Alto district relied. Nor does the fact that other opinions have qualified the relationship with, and right of an organization to sue for, its members. (Cf. *County of Alameda* v. *Carleson* (1971) 5 Cal.3d 730, 737, fn. 6 [97 Cal.Rptr. 385, 488 P.2d 953] [app. dism., 406 U.S. 913 (32 L.Ed.2d 112, 92 S.Ct. 1762)]; *Professional Fire Fighters, Inc.* v. *City of Los Angeles* (1963) 60 Cal.2d, 276, 283-284 & fn. 7 [32 Cal.Rptr. 830, 384 P.2d 158]; *International Union of United Auto. etc. Workers* v. *Department of Human Resources Dev.* (1976) 58 Cal.App.3d 924, 934-935 [130 Cal.Rptr. 368]; *Residents of Beverly Glen, Inc.* v. *City of Los Angeles* (1973) 34 Cal.App.3d 117, 122-123 [109 Cal.Rptr. 724]; and *Fuller* v. *San Bernardino Valley Mun. Wat. Dist.* (1966) 242 Cal.App.2d 52, 59 [51 Cal.Rptr. 120].) No such organization is involved here. As is recognized in some of the

Support for the Palo Alto district's position is found in *McCabe* v. *Atchison T. & S. F. R. Co., supra,* 235 U.S. 151. There the complainants sought to enforce their civil rights to equal accommodations on railroad trains. The court pointed out that the complainants failed to allege that they had ever requested or been refused such accommodations. It concluded, "The desire to obtain a sweeping injunction cannot be accepted as a substitute for compliance with the general rule that the complainant must present facts sufficient to show that his individual need requires the remedy for which he asks." (235 U.S. at p. 164 [59 L.Ed. at p. 175].) In the *Brown* case, *supra,* 187 F.2d 20, the Fifth Circuit applied this rule to dismiss a suit by a parent who sought relief from discrimination against his daughter by a school district. The court ruled, ". . . plaintiff has wholly failed to plead or prove any deprivation *of his civil rights* and it is elementary that *he has no standing to sue for the deprivation of the civil rights of others."* (187 F.2d at p. 25, italics the court's. See also *Shaw* v. *Garrison* (5th Cir. 1977) 545 F.2d 980, 983, fn. 4 [revd. on other grounds *sub nom. Robertson* v. *Wegmann,* 436 U.S. 584 (56 L.Ed.2d 554, 98 S.Ct. 1991)]; *O'Malley* v. *Brierley* (3d Cir. 1973) 477 F.2d 785, 789; and *Armstrong* v. *Board of Education of City of Birmingham, Ala.* (N.D.Ala. 1963) 220 F.Supp. 217, 218 [revd. on other issues, *Armstrong* v. *Board of Education of City of Birmingham* (5th Cir. 1964) 333 F.2d 47.)[5]

■ In this case the gravamen of the petitioners' complaint is that "petitioner' [*sic*] minority and non-minority children are being deprived of equal opportunities for education and are being denied equal protection and due process of law." The state and federal decisions

cases on which petitioners rely. *Parker* v. *Bowron* has continued vitality for the proposition that the petitioner for a writ of mandate for the performance of an act enjoined by law must show, "a clear, present and beneficial right in the petitioner to the performance of that duty . . . ." (*People* ex rel. *Younger* v. *County of El Dorado* (1971) 5 Cal.3d 480, 491 [96 Cal.Rptr. 553, 487 P.2d 1193]. See also, *Residents of Beverly Glen, Inc.* v. *City of Los Angeles, supra,* 34 Cal.App.3d 117, 127; *American Friends Service Committee* v. *Procunier* (1973) 33 Cal.App.3d 252, 256 [109 Cal.Rptr. 22]; *Fuller* v. *San Bernardino Valley Mun. Wat. Dist., supra,* 242 Cal.App.2d at p. 56.. Note, *La Sala* v. *American Sav. & Loan Assn.* (1971) 5 Cal.3d 864, 875, fn. 5 [97 Cal.Rptr. 849, 489 P.2d 1113]; and *McDonald* v. *Stockton Met. Transit Dist.* (1973) 36 Cal.App.3d 436, 440 [111 Cal.Rptr. 637].) Petitioners' further distinction predicated upon public interest in the enforcement of a public law is reviewed in the text below.

[5]Petitioners assert that *Brown* v. *Board of Trustees of La Grange Ind. Sch. Dist., supra,* 187 F.2d 20, has been emasculated because of the repudiation of the separate but equal doctrine. (See *Brown* v. *Board of Education* (1954) 347 U.S. 483, 494-495 [98 L.Ed. 873, 880-881, 74 S.Ct. 686, 38 A.L.R.2d 1180]; and *Evers* v. *Jackson Municipal Separate School District* (5th Cir. 1964) 328 F.2d 408, 410, fn. 2.) This contention is rejected as not relevant to the point at issue. Although not controlling, we find the federal case persuasive. As we note below in the text, the parents have alleged a violation of their children's rights, not a violation of any rights they may have to control the education of their children.

recognize that it is the child's right to equal educational opportunities that is protected by the Constitution. "[I]t is the constitutional right to equal treatment for all races that is being protected." (*Dayton Board of Education* v. *Brinkman* (1977) 433 U.S. 406 at p. 424 [53 L.Ed.2d 851 at p. 866, 97 S.Ct. 2766 at p. 2777] Brennan, J., conc. See also *Brown* v. *Board of Education, supra,* 347 U.S. 483, 495 [98 L.Ed. 873, 881]; *Crawford* v. *Board of Education, supra,* 17 Cal.3d 280, 307; and *Jackson* v. *Pasadena City School Dist.* (1963) 59 Cal.2d 876, 880 [31 Cal.Rptr. 606, 382 P.2d 878].) It would appear that the children, whose constitutional rights are allegedly violated, are the real parties in interest.

We note, however, that, without objection, parents have themselves alone sought and obtained relief. (*Dayton Board of Education* v. *Brinkman, supra,* 433 U.S. at p. 408, fn. 1 [53 L.Ed.2d at p. 856, 97 S.Ct. at p. 2769]; and *Keyes* v. *School District No. 1, Denver, Colo.* (1973) 413 U.S. 189, 191 [37 L.Ed.2d 548, 553, 93 S.Ct. 2686].) In *Keyes,* Mr. Justice Powell, in dissenting in part, noted, with respect to the rights and duties parents have with respect to their children, "The law has long recognized the parental duty to nurture, support, and provide for the welfare of children, including their education." (413 U.S. at pp. 246-247 [37 L.Ed.2d at p. 585].) Petitioners contend that a violation of parents' fundamental right to educate their children as they choose, gives them a right to sue. (See *Keyes* v. *School District No. 1, Denver, Colo., supra,* Powell, J., dissenting, at p. 247 [37 L.Ed.2d at p. 585]; *Griswold* v. *Connecticut* (1965) 381 U.S. 479, 482 [14 L.Ed.2d 510, 513, 85 S.Ct. 1678]; *Pierce* v. *Society of Sisters* (1925) 268 U.S. 510, 534-535 [69 L.Ed. 1070, 1077-1078, 45 S.Ct. 571, 39 A.L.R. 468]; *Meyer* v. *Nebraska* (1923) 262 U.S. 390, 399-400 [67 L.Ed. 1042, 1045, 43 S.Ct. 625, 29 A.L.R. 1446]; *Johnson* v. *San Francisco Unified School District* (9th Cir. 1974) 500 F.2d 349, 352-353; *Smuck* v. *Hobson* (D.C.Cir. 1969) 408 F.2d 175, 179, fn. 11; and *In re Roger S.* (1977) 19 Cal.3d 921, 928 [141 Cal.Rptr. 298, 569 P.2d 1286].) Although the violations alleged may have a tangential effect on the choices available to the parents, it is not directly alleged that such parental freedom of choice has been violated. (See *International Union of United Auto. etc. Workers* v. *Department of Human Resources Dev., supra,* 58 Cal.App.3d 924, 935.)

In *Pasadena City Bd. of Education* v. *Spangler* (1976) 427 U.S. 424 [49 L.Ed.2d 599, 96 S.Ct. 2697], the court recognized the derivative nature of any parent's right in holding that the action was moot as to the individual respondents, the original student plaintiffs and their parents, because the

students had all graduated from the school system under attack. (427 U.S. at pp. 429-430 [49 L.Ed.2d at p. 605].)

In *Serrano* v. *Priest* (1971) 5 Cal.3d 584 [96 Cal.Rptr. 601, 487 P.2d 1241] (cert. den., 432 U.S. 907 [53 L.Ed.2d 1079, 97 S.Ct. 2951]), the action was brought by the school children and their parents jointly. (*Id.,* at p. 589.) The right of the children to sue was phrased as follows: "[W]e are satisfied that plaintiff children have alleged facts showing that the public school financing system denies them equal protection of the laws because it produces substantial disparities among school districts in the amount of revenue available for education." (*Id.,* at p. 618.) The right of the parents to sue was predicated upon their standing as taxpayers to seek an injunction "to prevent public officers of a county from acting under an allegedly void law." (*Id.,* at p. 618.) No such relief is sought by the parents in this case. We also note that in *Bustop* v. *Superior Court* (1977) 69 Cal.App.3d 66 [137 Cal.Rptr. 793], the court ordered the trial court to permit an organization of 65,000 parents to intervene in the *Crawford* case (*Crawford* v. *Board of Education, supra,* 17 Cal.3d 280), to participate in the fashioning of any decree which might result in the mandatory reassignment and busing of students. (69 Cal.App.3d at p. 73. See also *Johnson* v. *San Francisco Unified School District, supra,* 500 F.2d 349, 352-354; and *Smuck* v. *Hobson, supra,* 408 F.2d 175, 177-182. Cf. *Hatton* v. *County Board of Education of Maury Co., Tenn.* (6th Cir. 1970) 422 F.2d 457, 460-461.) These decisions indicate that the parents may have an interest in the remedy to be granted, but they do not destroy the principle that a violation of the child's right must be shown before any remedy may be invoked.

The allegation "Petitioners bring this action on their own behalf and on behalf of all persons similarly situated" adds naught to their case. ■ It is established that in order to sustain a class suit the complainant must be a person who is entitled to the right asserted. (*Parker* v. *Bowron, supra,* 40 Cal.2d 344.) In *Parker* the court stated, "Parker cannot give himself standing to sue by purporting to represent a class of which he is not a member." (40 Cal.2d at p. 353. See also, *Pasadena City Bd. of Education* v. *Spangler, supra,* 427 U.S. 424, 430 [49 L.Ed.2d 599, 605].)

■ Appellants also assert that the parents' right to sue may be predicated on the principle that the failure of a minor to proceed through a guardian ad litem does not affect the jurisdiction of the court and may be waived (see *Pacific Coast etc. Bank* v. *Clausen* (1937) 8 Cal.2d 364, 366 [65 P.2d 352]; *Dunn* v. *Dunn* (1896) 114 Cal. 210, 212 [46 P. 5]; *Cikuth* v.

*Loero* (1936) 14 Cal.App.2d 32, 33 [57 P.2d 1009]; *Hughes* v. *Quackenbush* (1934) 1 Cal.App.2d 349, 362-363 [37 P.2d 99]; and *King* v. *Wilson* (1931) 116 Cal.App. 191, 193-195 [2 P.2d 833]. See also *Johnston* v. *Southern Pacific Co.* (1907) 150 Cal. 535, 539 [89 P. 348]; and *In re Cahill* (1887) 74 Cal. 52, 57 [15 P. 364]), or an amendment appointing such a guardian may be permitted. *(In re Cahill, supra,* at pp. 54-59. Note, also, *Jolicoeur* v. *Mihaly* (1971) 5 Cal.3d 565, 582, fn. 12 [96 Cal.Rptr. 697, 488 P.2d 1]; and *Doyle* v. *Loyd* (1941) 45 Cal.App.2d 493, 496-497 [114 P.2d 398].) That argument misses the mark. Here the shoe is on the other foot; it is the parent, not the minor, who is originally before the court.

At oral argument and by supplemental briefs petitioners for the first time contended that they had standing under the general principle adopted and endorsed in *Bd. of Soc. Welfare* v. *County of L. A.* (1945) 27 Cal.2d 98 [162 P.2d 627], reading as follows: " '[B]y the preponderance of authority . . . where the question is one of public right and the object of the mandamus is to procure the enforcement of a public duty, the relator need not show that he has any legal or special interest in the result, since it is sufficient that he is interested as a citizen in having the laws executed and the duty in question enforced. . . .' " (27 Cal.2d at pp. 100-101, quoting 35 Am.Jur., § 320, p. 73 [state board seeking local government compliance with its orders]. Accord, *Hollman* v. *Warren* (1948) 32 Cal.2d 351, 357 [196 P.2d 562] [applicant seeking to force Governor to exercise discretion, denied by alleged unconstitutional law, to appoint notaries]; *McDonald* v. *Stockton Met. Transit Dist., supra,* 36 Cal.App.3d 436, 440 [rule not applied]; *Residents of Beverly Glen, Inc.* v. *City of Los Angeles, supra,* 34 Cal.App.3d 117, 127 [residents' organization attacking use permit granted pursuant to an alleged unconstitutional ordinance]; *American Friends Service Committee* v. *Procunier, supra,* 33 Cal.App.3d 252, 256 [attack on rules and regulations of Adult Authority by corporations interested in prisoner welfare]; *Diaz* v. *Quitoriano* (1969) 268 Cal.App.2d 807, 811 [74 Cal.Rptr. 358] [class action to force Department of Social Welfare to advise petitioner and others of their rights]; and *Fuller* v. *San Bernardino Valley Mun. Water Dist., supra,* 242 Cal.App.2d 52, 58 [right of petitioners for formation of nonmunicipal water district to secure order terminating attempted subsequent annexation of some territory by neighboring district]. See also, *Ballard* v. *Anderson* (1971) 4 Cal.3d 873, 876 [95 Cal.Rptr. 1, 484 P.2d 1345, 42 A.L.R.3d 1392] [public interest precluding dismissal as moot]. Note, Code Civ. Proc., § 526a; *Serrano* v. *Priest, supra,* 5 Cal.3d 584, 618; and *Blair* v. *Pitchess* (1971) 5 Cal.3d 258, 267-270 [96 Cal.Rptr. 42, 486 P.2d 1242, 45 A.L.R.3d 1206].) The parents here are not suing as an organization to enforce the rights of their own members. Their interest as parents and members of the public,

as we have seen, may make them proper parties, and justify their intervention in the action. Nevertheless in the face of proper objection the children should be joined too. As we construe the record and the order of the lower court, the trial court never did reach the point of exercising its discretion to permit the parents to sue solely in their own name on behalf of their children, nor did it determine that there was no need for the appointment of a guardian ad litem. There is some merit to Palo Alto district's contention that a showing of violation of personal rights, asserted by those allegedly injured, rather than mere public interest, should be a requisite in cases of this nature so that the rights of the children themselves may be properly protected. (See *Sierra Club* v. *Morton* (1972) 405 U.S. 727 [31 L.Ed.2d 636, 92 S.Ct. 1361].) There the court stated: "The requirement that a party seeking review must allege facts showing that he is himself adversely affected does not insulate executive action from judicial review, nor does it prevent any public interests from being protected through the judicial process. It does serve at least as a rough attempt to put the decision as to whether review will be sought in the hands of those who have a direct stake in the outcome." (405 U.S. at p. 740 [31 L.Ed.2d at p. 646].)

For the purposes of this case it is unnecessary to consider whether the failure to join the minor students as plaintiffs requires dismissal of the action, or whether it is a defect which may be waived. We merely need conclude that in the face of objection, such as interposed by the Palo Alto district in this case, the minors should be joined as plaintiffs. The error of the trial court in ruling on that phase of the Palo Alto district's demurrer does not require an affirmance of the judgment. It is analogous to an erroneous ruling on a special demurrer, which does not warrant a reversal but a remand for amendment. Here in view of the trial court's favorable rulings, the petitioners never had cause to seek to amend by bringing in their children as parties. In *Klopstock* v. *Superior Court, supra,* 17 Cal.2d 13, the court upheld an amendment which permitted further prosecution of an action by a proper party, despite a prior ruling that the original plaintiff had no standing to sue. The court stated: "The defendants have been fully apprised since the filing of the original complaint of the facts which are relied upon to state a right to relief against them in behalf of the corporation. Under the facts of this case, therefore, we hold that the amendment complained of did not constitute the statement of a wholly different cause of action which would prevent amendment of the complaint, but, on the contrary, was well within the liberal discretion which is granted to the courts by Code of Civil Procedure, section 473." (17 Cal.2d at p. 21. See also, *La Sala* v. *American Sav. & Loan Assn., supra,* 5 Cal.3d 864, 872, 873-874 & 875-876.)

So here, insofar as the petitioners may have stated a cause of action on behalf of their children they should be permitted to amend to make the children themselves parties. We therefore must analyze the merits of the complaint from the standpoint of the children's constitutional rights.

## III

■ In our examination of the charging facts alleged by the petitioning parents we treat the demurrer as admitting all material facts properly pleaded, but not contentions, deductions or conclusions of fact or law. (*Serrano* v. *Priest, supra,* 5 Cal.3d 584, 591; *Daar* v. *Yellow Cab Co.* (1967) 67 Cal.2d 695, 713 [63 Cal.Rptr. 724, 433 P.2d 732]; *People* ex rel. *Lynch* v. *San Diego Unified School Dist.* (1971) 19 Cal.App.3d 252, 257 [96 Cal.Rptr. 658] [cert. den., 405 U.S. 1016 (31 L.Ed.2d 478, 92 S.Ct. 1288)].)

After setting forth the status of petitioners (see part II above), it is alleged that the respondents named, with the exception of the San Mateo County Superintendent of Schools, are political entities organized and existing under the laws of the State of California. It is further stated that all of the respondents involved in this appeal and the respondents state and state board of education (see part I above), but not Sequoia Union High School District, are joined on the grounds stated in Code of Civil Procedure section 379, subdivision (a)(1) and section 379, subdivision (c);[6] and that all respondents are likewise joined on the grounds set forth in section 389, subdivision (a) of that code.[7] It is expressly alleged that the Sequoia Union High School District (not a party to this appeal, see part I) is a fully desegregated district which is included only because the relief requested may affect it.[8]

---

[6]Section 379 provides in pertinent part: "(a) All persons may be joined in one action as defendants if there is asserted against them: [¶] (1) Any right to relief jointly. severally. or in the alternative. in respect of or arising out of the same transaction. occurrence. or series of transactions or occurrences and if any question of law or fact common to all these persons will arise in the action; or . . . (c) Where the plaintiff is in doubt as to the person from whom he or she is entitled to redress. he or she may join two or more defendants. with the intent that the question as to which, if any, of the defendants is liable, and to what extent. may be determined between the parties."

[7]Subdivision (a) of section 389 provides: "A person who is subject to service of process and whose joinder will not deprive the court of jurisdiction over the subject matter of the action shall be joined as a party in the action if (1) in his absence complete relief cannot be accorded among those already parties or (2) he claims an interest relating to the subject of the action and is so situated that the disposition of the action in his absence may (i) as a practical matter impair or impede his ability to protect that interest or (ii) leave any of the persons already parties subject to a substantial risk of incurring double, multiple. or otherwise inconsistent obligations by reason of his claimed interest. If he has not been so joined. the court shall order that he be made a party."

[8]For an account of desegregation actions in Sequoia Union High School District see *Stanton* v. *Sequoia Union High School Dist.* (N.D.Cal. 1976) 408 F.Supp. 502, *Gomperts* v.

Petitioners set forth their conclusions concerning the respective obligations of the state and the rights of children in this state with regard to a public school education under the provisions of article I, section 7 and article IX of the state Constitution;[9] and their understanding of the relationship between respondents and the state under article IX.[10] The legal principles governing those conclusions are reviewed below.

The petition alleges: "For at least five years past and continuing to the present, racially segregated schools exist in the respondent school districts. Out of a total of approximately thirteen thousand students attending elementary schools within the boundaries of the SEQUOIA UNION HIGH SCHOOL DISTRICT, approximately ten thousand non-minority students attend schools which are predominantly non-minority and approximately three thousand minority students attend schools which are predominantly minority. [¶] A comparable situation exists in the Palo Alto Unified School District. Thus both non-minority and minority students are racially isolated and deprived of an integrated educational experience."

In support of these allegations the petitioners have attached and incorporated a computation setting forth in percentages the ethnic composition of the student population of each elementary school district in the respondent school districts. Reference to the original petition reveals that the computation was for the school year 1975-1976. It reflects that of five elementary schools in the Ravenswood City School District, four each had 98 percent minority students, and a fifth, 73 percent. In the other schools of elementary school districts within the Sequoia Union High School District the percentage of minority students ranged from 1

*Chase* (N.D.Cal. 1971) 329 F.Supp. 1192, and *Gomperts* v. *Chase* (1971) 404 U.S. 1237 [30 L.Ed.2d 30, 92 S.Ct. 16], Douglas, J., denying injunction.

[9]These articles provide: Article I, section 7 reads: "(a) A person may not be deprived of life, liberty, or property without due process of law or denied equal protection of the laws. [¶] (b) A citizen or class of citizens may not be granted privileges or immunities not granted on the same terms to all citizens. Privileges or immunities granted by the Legislature may be altered or revoked."

Article IX, section 1 provides: "A general diffusion of knowledge and intelligence being essential to the preservation of the rights and liberties of the people, the Legislature shall encourage by all suitable means the promotion of intellectual, scientific, moral, and agricultural improvement."

[10]Article IX, section 14 provides: "The Legislature shall have power, by general law, to provide for the incorporation and organization of school districts, high school districts, and community college districts, of every kind and class, and may classify such districts. [¶] The Legislature may authorize the governing boards of all school districts to initiate and carry on any programs, activities, or to otherwise act in any manner which is not in conflict with the laws and purposes for which school districts are established."

percent to 64 percent.[11] It is specifically alleged that the four schools in the Ravenswood City School District are minority segregated schools, and generally alleged that the minority enrollments in said schools are so disproportionate as realistically to isolate minority students from other students and thus to deprive minority students of a racially integrated educational experience.

Insofar as the complaint purports to allege that racially segregated schools exist in each of the respondent school districts we must analyze the use of the term "segregated." In *Crawford* v. *Board of Education, supra,* 17 Cal.3d 280, the court stated: "Our decisions . . . require only that school districts take reasonable and feasible steps to eliminate *segregated* schools, i.e., schools in which the minority student enrollment is so disproportionate as realistically to isolate minority students from other students and thus deprive minority students of an integrated educational experience." (17 Cal.3d at p. 303.) That language, however, was qualified by a footnote reading: "In neither this case, nor the companion *San Bernardino* case (*post* at p. 311 . . .) has any party suggested the propriety or necessity of implementing a 'metropolitan plan' remedy that would involve the assignment of pupils outside of the particular school district in which they reside. (Cf. *Milliken* v. *Bradley, supra,* 418 U.S. 717.) Accordingly, we have not considered that issue and address only the question of an individual school board's duty with respect to the students within its own district." (*Id.,* fn. 14.) That this definition referred to intradistrict segregation is also evidenced from the following page, where the opinion states: "In sum, from a constitutional standpoint, we see nothing inherently invalid in the fact that percentages of various racial or ethnic groups may vary, even significantly, in different schools *throughout a school district,* or even that a particular minority group may be completely unrepresented in a particular school. On the

[11]We take judicial notice of the relative location of respondent school districts as set forth in a copy of a map, purportedly from an official committee on school district reorganization report, attached to appellant's opening brief. (See *Serrano* v. *Priest, supra,* 5 Cal.3d 584, 591.) In two districts adjoining Ravenswood, the percentage of minority students ranged as follows: Menlo Park Elementary School District, from 2 percent to 7 percent in 4 schools, and Redwood City Elementary District from 5 percent to 64 percent in 16 schools. In three other districts lying southeast of Ravenswood and Menlo Park the respective percentages were: Las Lomitas Elementary School District from 1 percent to 8 percent in four schools; Woodside Elementary School District 2 percent in a single school; and Portola Valley Elementary District, from 1 percent to 3 percent in three schools. Northeast of the Redwood City district, San Carlos Elementary School District ranged from 3 percent to 12 percent in seven schools, and Belmont Elementary School District from 5 percent to 14 percent in seven schools. The large Palo Alto Unified School District which adjoins Ravenswood on the south has 24 elementary schools, with minority populations which ranged from 3 percent to 56 percent.

other hand, if the minority enrollment in a school is so disproportionate as realistically to isolate minority students from other students *in the district,* a finding of unconstitutional segregation will generally be proper." (*Id.,* at p. 304, italics added, fn. omitted.) Significantly the footnote states: "Although, as we have emphasized, for constitutional purposes a school may be desegregated without being racially balanced, this does not mean that reference should not be made to the racial composition of the district as a whole in determining whether a given school is segregated or not. Thus, for example, in a school district in which 'minority' students significantly outnumber 'majority' students, a school whose racial composition might in some other district make it a 'segregated school' may not warrant that legal characterization. Unquestionably in many situations the determination of whether a given school is 'segregated' or not, under the above guidelines, will be a difficult decision, but we believe the variety of factual settings existing throughout our state foreclose a more rigid or concrete definition. . . ." (*Id.,* fn. 16.)

*Jackson* v. *Pasadena City School Dist., supra,* 59 Cal.2d 876, mandates that the averments with respect to racial segregation should be treated on general demurrer as allegations of ultimate facts and not mere conclusions of law. (59 Cal.2d at p. 879.) We conclude that in the light of the later decision we should find the meaning of "segregated schools" as used in this complaint in the light of the whole record. It then appears from the other allegations of the complaint, from the relief sought, and from the arguments advanced by appellants below and in this court, that the students in Ravenswood are isolated from majority students in other districts, and the students in other districts are isolated from minority students because of the respective racial composition of the school population of each of the districts. Interdistrict relief is sought from this imbalance. There is no contention that any of the respondent districts has an invalid imbalance among its own schools which can be alleviated by intradistrict action.

It is further alleged that the racial composition of faculty and staff of the Ravenswood district schools is disproportionately minority when compared with that of the schools in the surrounding districts: Attached statistics indicate that 47 percent of the certified staff is of minority ethnic origin in Ravenswood, as distinguished from a range of 3 percent to 10 percent in the other elementary districts.

The petitioners focus on the mid-Peninsula community, that is, the community residing within the boundaries of the Palo Alto Unified School District and the Sequoia Union High School District. They allege

that this community and the school administrators and teachers of the encompassed school districts regard the Ravenswood schools as black schools, and as inferior schools. Test scores for the school years 1974-1975 and 1975-1976, attached to the complaint allegedly demonstrate the inferior performance of Ravenswood pupils as compared with the pupils in respondent districts.[12]

Petitioners aver that because of the great preponderance of minority students within the boundaries of the Ravenswood City School District, and the preponderance of nonminority students in the other schools, that the only reasonable feasible steps available to eliminate or to alleviate racially segregated schools involve both the school districts surrounding Ravenswood and the Ravenswood district itself, and that therefore an interdistrict remedy arrived at in concert provides the only reasonably feasible solution.[13]

They allege that since at least 1971 each respondent has had actual knowledge of the existence of the aforementioned "racially segregated schools"; that as agents of the State of California respondents have the constitutional duty, and acting jointly and in cooperation with one another, the power to eliminate "racially segregated schools" in the

[12]In 1974-1975, the range of performance of Ravenswood pupils was from the 3d to 16th percentile as compared to a range of 43d to 97th percentile in the other elementary schools. This discrepancy is emphasized if Redwood City (45th to 64th percentile) is omitted, because the remaining districts' students ranged from the 78th to the 97th percentile.

In 1975-1976, the commensurate figures were from 4th to 34th percentile for Ravenswood district as compared to a range of from 45th to 97th for pupils of the other schools—71st to 97th if Redwood City district is disregarded.

We note, as suggested by respondent Ravenswood, that the figures do not compare performance by minority students in segregated and in integrated schools.

[13]More specifically it is alleged that reasonably feasible steps were and are available to respondents, acting jointly, to eliminate or alleviate what petitioners term "racially segregated schools" (cf. text above). Three plans involving reorganization of the school districts are suggested. Plan 1 involves a transfer of Ravenswood, Menlo Park, Las Lomitas and Portola Valley elementary districts and so much of Sequoia Union High School District as embraces those districts to Palo Alto Unified School District. Plan 2 involves the creation of a unified district embracing Sequoia Union High School District and all of the elementary districts embraced in its territory. Plan 3 involves the formation of a new union elementary district comprised of Portola Valley, Las Lomitas and Menlo Park elementary districts and so much of Ravenswood district as lies within the City of Menlo Park; and, as well, the incorporation into the Palo Alto Unified School District of the remaining territory of the Ravenswood district.

Petitioners assert that upon any such reorganization, techniques of pairing schools, model schools, redrawing of attendance boundaries of individual schools and the reassignment of students to schools could be used to eliminate or alleviate segregated schools.

respondent school districts; that they have failed to take available reasonably feasible steps to eliminate or to alleviate "the segregated schools" although at all times relevant they have been able to do so; and that by reason of that failure the petitioners' minority and nonminority children are being deprived of equal opportunities for education and are being denied equal protection and due process of law.

The allegations of a further controversial paragraph are reviewed below.

Both sides agree that the complaint frames the issue, left unresolved in *Crawford* (17 Cal.3d at p. 303, fn. 14), as to the extent and manner a court may intervene to order the correction of racial imbalance in public schools which is manifest in a geographical area embracing two or more independent school districts.

## IV

As we have set forth, petitioners rely on their children's rights under the Constitution of the State of California. The California decisions "authoritatively establish that in this state school boards do bear a constitutional obligation to take reasonable steps to alleviate segregation in the public schools, whether the segregation be de facto or de jure in origin." (*Crawford* v. *Board of Education, supra,* 17 Cal.3d 280, 290; see pp. 290-302. See also *National Assn. for Advancement of Colored People* v. *San Bernardino City Unified Sch. Dist.* (1976) 17 Cal.3d 311, 325 [130 Cal.Rptr. 744, 551 P.2d 48]; *Santa Barbara Sch. Dist.* v. *Superior Court* (1975) 13 Cal.3d 315, 325-328 [118 Cal.Rptr. 637, 530 P.2d 605]; *Serrano* v. *Priest, supra,* 5 Cal.3d 584, 603-604; *San Francisco Unified School Dist.* v. *Johnson* (1971) 3 Cal.3d 937, 957-958 [92 Cal.Rptr. 309, 479 P.2d 669] [cert. den., 401 U.S. 1012 (28 L.Ed.2d 549, 91 S.Ct. 1266)]; *Jackson* v. *Pasadena City School Dist., supra,* 59 Cal.2d 876, 881; and *People* ex rel. *Lynch* v. *San Diego Unified School Dist., supra,* 19 Cal.App.3d 252, 264-265.) In *San Francisco Unified School Dist.* v. *Johnson, supra,* the court observed: "[I]t is the presence of racial isolation, not its legal underpinnings, that creates unequal education. [Citation.]" (3 Cal.3d at p. 949.)

It is·clear that this state, regardless of the interpretations given to equal protection under the Fourteenth Amendment by the highest court of the nation, may determine its own standards for evaluating equal protection under the California Constitution. (*Serrano* v. *Priest, supra,* 18 Cal.3d 728, 762-768. Cf. *Serrano* v. *Priest, supra,* 5 Cal.3d 584, 596, fn. 11

& pp. 617-618, with *San Antonio School District* v. *Rodriguez* (1973) 411 U.S. 1, 54-55 [36 L.Ed.2d 16, 55, 93 S.Ct. 1278].) Nevertheless there are several factors that impel us to examine the decision on interdistrict segregation in *Milliken* v. *Bradley, supra,* 418 U.S. 717. In the first place the decisions referred to above all deal with instances of alleged intradistrict segregation, as was treated in *Crawford* and has been reviewed above (part III). Secondly, some of the respondents rely upon the principles enunciated in *Milliken* in support of the lower court's decision. Finally, we feel that the facts in this case should be weighed against certain factors which the Supreme Court recognized as possible grounds for relief, despite denial of relief under the facts presented.

### A

In *Milliken* a majority of the court reversed a circuit court decision which had approved an order of the district court establishing a desegregation area, consisting of the City of Detroit with 276,000 students and 53 adjacent school districts with 503,000 students, after finding that it was otherwise impossible to accomplish desegregation in the city. The Supreme Court determined that a federal court may not impose a multi-district, areawide remedy to a single district de jure segregation problem absent any finding [1] that the other included school districts had failed to operate a unitary school system within their districts; [2] absent any claim or finding that the boundary lines of any affected school district were established with the purpose of fostering racial segregation in public schools; [3] absent any finding that the included districts committed acts which effected segregation within the other districts; and [4] absent a meaningful opportunity for the included neighboring school districts to present evidence or be heard on the propriety of a multi-district remedy or on the question of constitutional violation by those neighboring districts. (418 U.S. at pp. 721-722 [41 L.Ed.2d at p. 1078].)[14]

[14]In its opinion the majority states: "Of course, no state law is above the Constitution. School district lines and the present laws with respect to local control, are not sacrosanct and if they conflict with the Fourteenth Amendment federal courts have a duty to prescribe appropriate remedies. See. *e.g.. Wright* v. *Council of the City of Emporia,* 407 U.S. 451 [33 L.Ed.2d 51, 92 S.Ct. 2196] (1972); *United States* v. *Scotland Neck Board of Education,* 407 U.S. 484 [33 L.Ed.2d 75, 92 S.Ct. 2214] (1972) (state or local officials prevented from carving out a new school district from an existing district that was in process of dismantling a dual school system); cf. *Haney* v. *County Board of Education of Sevier County,* 429 F.2d 364 (CA8 1970) (State contributed to separation of races by drawing of school district lines); *United States* v. *Texas,* 321 F.Supp. 1043 (Ed Tex. 1970), aff'd, 447 F.2d 441 (CA5 1971), cert. denied *sub. nom. Edgar* v. *United States,* 404 U.S. 1016 [30 L.Ed.2d 663, 92 S.Ct. 675] (1972) (one or more school districts created and maintained for one race)." (418 U.S. at p. 744 [41 L.Ed.2d at p. 1091].) In addition to the cases cited above we are invited by amicus curiae to consider other federal cases dealing

A search for factors which may implicate any of the respondent districts under the foregoing formula leads to paragraph X of the petition. There the petitioners allege: "Petitioners expressly do not allege any 'de jure', 'de facto' or any acts of any of the respondents which may have contributed, significantly or insignificantly, to the present situation of racially segregated schools in the respondent school districts. However, in support only of the allegation that at all relevant times the respondents had knowledge of segregated schools within each of the respondent school districts, petitioners attach hereto and incorporate herein Exhibit E."

Reference to exhibit E reflects that it alleges that in 1974 and 1976 there were realignments of school district boundaries between Ravenswood and Menlo Park districts which increased racial imbalance; that a pending reorganization involving Belmont Elementary District and Sequoia Union High School will have a similar effect; that the San Mateo County Committee on School District Organization has approved all of

with segregation in metropolitan areas. Since, as set forth below, we part company with prevailing Fourteenth Amendment interpretation of actionable segregation, we do not pursue that analysis. We do note, however, the following: Richmond, Virginia (*Bradley* v. *School Board of City of Richmond, Virginia* (E.D.Va. 1972) 338 F.Supp. 67, revd. (4th Cir. 1972) 462 F.2d 1058; affd. by an equally divided court (1973) 412 U.S. 92 [36 L.Ed.2d 771, 93 S.Ct. 1952]. See Dell'Ario, *Remedies for School Segregation: A Limit on The Equity Power of the Federal Courts?* (1975) 2 Hastings Const.L.Q. 113, 122-128; and Note, *Segregation in the Metropolitan Context: The "White Noose" Tightens* (1972) 58 Iowa L. Rev. 322); Comment, *Housing Remedies* (1977) 12 Harv. Civ. Rights-Civ. Lib. L.Rev. 649; Case Note (1977) 42 Mo.L.Rev. 635; and Note, *Interdistrict Desegregation: the Remaining Options* (1976) 28 Stan.L.Rev. 521, 553-554); and generally the Note last cited and Note, *Consolidation for Desegregation* (1973) 82 Yale L.J. 1681.

We also note litigation of long duration in Delaware, culminating in current proceedings in the United States Supreme Court. (See *Evans* v. *Buchanan* (D.Del. 1974) 379 F.Supp. 1218, affd. *Buchanan* v. *Evans* (1975) 423 U.S. 963 [46 L.Ed.2d 293, 96 S.Ct. 381]; *Evans* v. *Buchanan* (D.Del. 1976) 416 F.Supp. 328, opns. dism. (1976) 429 U.S. 973 [50 L.Ed.2d 579, 97 S.Ct. 475, 476], affd. (1977) *Evans* v. *Buchanan* (3d Cir. 1977) 555 F.2d 373 [cert. denied (1977) 434 U.S. 880 [54 L.Ed.2d 160, 98 S.Ct. 443]]; *Evans* v. *Buchanan* (D.Del. 1978) 447 F.Supp. 982, affd. *Evans* v. *Buchanan* (3d Cir. 1978) 582 F.2d 750, petitions for cert. filed Oct. 20, 1978, No. 78-761 *Delaware State Board of Education* v. *Evans* [stay den. 99 S.Ct. 28], and No. 78-762 *Alexis I. Du Pont School District* v. *Evans* [(1978) stay den. 439 U.S. 1375 (58 L.Ed.2d 83, 99 S.Ct. 32). See also, *Columbus Board of Education* v. *Penick* (1978) 439 U.S. 1348 [58 L.Ed.2d 55, 99 S.Ct. 24][No. 78-610, stay granted], and *Dayton Board of Education* v. *Brinkman* (1978) 439 U.S. 1358 [58 L.Ed.2d 67, 99 S.Ct. 28] [No. 78-671, stay den.].)

The prospects of securing desegregation of urban school districts under the exceptions noted in *Milliken*, have also been the subject of study. (See Note, *Interdistrict Desegregation: The Remaining Options, supra*, 28 Stan.L.Rev. 521; Taylor, *The Supreme Court and Urban Reality* (1975) 21 Wayne L.Rev. 751; and Hain, *Techniques of Governmental Reorganization to Achieve School Desegregation* (1975) *id.*, p. 779.)

the foregoing; that in 1966 (see *San Carlos Sch. Dist.* v. *State Bd. of Education* (1968) 258 Cal.App.2d 317 [65 Cal.Rptr. 711]) and 1972 proposals for unification of respondent elementary districts (exclusive of the Palo Alto Unified School District), were defeated by the voters; that after a history of opposition by some of respondent school districts, the two respondent county committees on school district organization undertook a study of several different plans for the merger of Ravenswood, Las Lomitas, Menlo Park and Portola Valley elementary districts and a portion of Sequoia Union High School District with the Palo Alto Unified School District; and in 1976 the joint committees formally voted against such merger; that an integrated center school for pupils of Ravenswood and three other elementary districts which existed from 1973 to 1975 was closed by inaction of the districts; that the State Board of Education has failed to adopt regulations requiring local districts to act to eliminate "segregated schools"; that Ravenswood district has refused application for interdistrict transfer and adopted a policy against interdistrict transfer; that Menlo Park and Palo Alto districts have restricted interdistrict attendance by restrictive residency requirements. It is alleged that all of these acts and omissions occurred with knowledge that they would substantially increase "segregated schools" in the respective districts.

■ The San Mateo respondents demurred on the ground, among others, that the allegations of the petition, as amended by the third amendment, which included the language in paragraph X quoted above, are vague and contain conclusions of law rather than ultimate facts. A separate demurrer interposed by the Ravenswood district raised the same point. In its order sustaining and overruling demurrers without leave to amend the court listed, among other grounds: "The allegations of the Third Amended Petition, specifically paragraph X and Exhibit E, are vague and contain conclusions of law rather than ultimate facts."

On appeal petitioners contend that the trial court erred because "vagueness" is not a proper ground for demurrer, and because exhibit E only contains allegations of fact showing factual events evidencing respondents' knowledge of segregated schools. The San Mateo respondents insist that paragraph X and the incorporated exhibit contain vague and conclusionary allegations rather than ultimate facts. They contend that petitioners have failed to allege a causal connection between the acts or omissions set forth in the exhibit, and the segregation that they seek to have eliminated or alleviated. We do not reach these issues. We accept at

face value the statements in the body of paragraph X that the matter in exhibit E is not to be considered to establish "any acts of any of the respondents, which may have contributed, significantly or insignificantly to the present situation of racially segregated schools in the respondent school districts," but "in support only of the allegation that at all relevant times the respondents had knowledge of segregated schools within each of the respondent school districts." As such the allegation in exhibit E cannot render the express allegations of paragraph X uncertain, ambiguous or unitelligible (Code Civ. Proc., § 430.10, subd. (f)); nor is the combined effect such as to reduce the disclaimer of any "de jure" or "de facto" segregation to a mere conclusion of law. As mere evidential matter, the exhibit was probably subject to motion to strike and we disregard it, except as it may throw light on the history of the controversy giving rise to this action.

We do so because it is evident that petitioners have elected to frame their case on a theory of liability without fault. In their second amended complaint the facts alleged in exhibit E were referred to in support of several allegations including the allegation "that respondents have failed and refused to adopt any plan or plans to eliminate segregation . . . ." That allegation was expressly deleted in the third amendment. At the hearing on the demurrer to the third amended complaint counsel explained that the amendment was framed as it was to preclude any inference that petitioners were alleging an intentional or unintentional act causing segregation on the part of any respondent.[15] Again, in their closing brief appellant-petitioners assert "Respondents' argument *assumes* that to state a cause of action, the petition must allege acts by one district having a segregative effect in another district. It is appellants' position that a cause of action based on a violation of the California Constitution is stated without such an allegation." We conclude that in their zeal to establish the latter position, petitioners have expressly

[15]Petitioners' counsel stated: "The ambiguities [in the second amended complaint] seemed to arise because Your Honor felt that perhaps the paragraph 10 did allege some unintentional act by some of the school districts which had a segregative effect, so we amended paragraph 10 to state that we expressly do not allege any de jure, de facto or any act which may have contributed significantly or insignificantly to racial segregation in the school. And we then limited paragraph 10 to simply be an exhibit in support of the allegation that the respondents simply knew that there were segregated schools within each of their own districts.

"I feel, then, as a matter of absolute law and fact, we have taken any ambiguity by which respondents can claim that we are by Exhibit E trying to allege any type of intentional or unintentional act. We have clearly said we do not so allege that and we have clearly said that that exhibit is not to be read that way. I don't see how our own disclaimer can be somehow then made ambiguous. We have tried to clear up that ambiguity as expressly as we can. We are stuck with what we have said."

elected to refrain from pleading or seeking relief on any of the exceptions noted in *Milliken*. The trial court erred in sustaining the special demurrer after petitioners made that election, but it also erred in not striking exhibit E when that course was suggested by the San Mateo respondents.

B

Each side suggests that an uncritical adherence to existing precedent furnishes grounds for its position. Appellants, in reliance upon the California mandate to eliminate or alleviate segregation whenever it occurs within a district, insist that the same principle must be applied between districts without reference to whether a district by act or omission caused or contributed to the imbalance within each district. Respondents, despite the disparity between California and federal constitutional law, insist that principles enunciated in *Milliken* should control.

In this state the Supreme Court has consistently recognized that racial imbalance in education is itself a violation of the state Constitution regardless of cause. The evil to be corrected was phrased as follows in *San Francisco Unified School Dist.* v. *Johnson, supra*: "Our analysis begins with the classic ruling in *Brown* v. *Board of Education* (1954) 347 U.S. 483, 495 [98 L.Ed. 873, 881, 74 S.Ct. 686, 38 A.L.R.2d 1180], that 'separate educational facilities are inherently unequal.' Evidence accumulated since 1954 has amply confirmed former Chief Justice Warren's declaration. The 1967 report of the United States Commission on Civil Rights, 'Racial Isolation in the Public Schools,' found that, all other factors being equalized, Negroes in segregated schools have lower educational achievement than Negroes in integrated schools. (Finding 8, p. 204.) The transfer of Negroes to integrated institutions, the commission noted, substantially betters their educational performance without harming the performance of white students. (See pp. 100-109.) [¶] The commission offered the following explanation: 'The environment of schools with a substantial majority of Negro students . . . offers serious obstacles to learning. The schools are stigmatized as inferior in the community. The students often doubt their own worth, and their teachers frequently corroborate these doubts. The academic performance of their classmates is usually characterized by continuing difficulty. The children often have doubts about their chances of succeeding in a predominately white society and they typically are in school with other students who have similar doubts. They are in schools which, by virtue of both their racial and social class composition, are isolated from models of success in school.' (P. 106.) [¶] The commission went on to note that 'racial isolation

in the schools . . . fosters attitudes and behavior that perpetuate isolation in other important areas of American life. Negro adults who attend racially isolated schools are more likely to have developed attitudes that alienate them from whites. White adults with similarly isolated backgrounds tend to resist desegregation in many areas—housing, jobs, and schools.' (P. 110.)" (3 Cal.3d at p. 949. See also *Crawford* v. *Board of Education, supra,* 17 Cal.3d 280, 295-296; *Serrano* v. *Priest, supra,* 5 Cal.3d 584, 605-610; *Manjares* v. *Newton* (1966) 64 Cal.2d 365, 375-376 [49 Cal.Rptr. 805, 411 P.2d 901]; and *People* ex rel. *Lynch* v. *San Diego Unified School Dist., supra,* 19 Cal.App.3d 252, 263-266.)[16]

The language used to justify intradistrict relief from such imbalance appears broad enough to transcend district lines. In *Jackson,* the court stated: "The harmful influence on the children will be reflected and intensified in the classroom if school attendance is determined on a geographic basis without corrective measures. The right to an equal opportunity for education and the harmful consequences of segregation require that school boards take steps, insofar as reasonably feasible, to alleviate racial imbalance in schools regardless of its cause." (59 Cal.2d at p. 881. See also *Crawford* v. *Board of Education, supra,* 17 Cal.3d at pp. 301-302; *Mulkey* v. *Reitman* (1966) 64 Cal.2d 529, 537 [50 Cal.Rptr. 881, 413 P.2d 825]; and *San Francisco Unified School Dist.* v. *Johnson, supra,* 3 Cal.3d at p. 949.) ▆▆▆ Unless there are supervening factors impelling a contrary conclusion, we are led to conclude, as urged by petitioners, that the California Constitution, as interpreted by our Supreme Court,

---

[16]Ravenswood City Elementary School District has filed a brief in support of the judgment of the lower court. It argues for community control of its elementary school, and suggests that at the trial the petitioners would have difficulty in proving that the district had not been sensitive to the needs of its minority pupils, and that any remedy would lead to the disestablishment of the district and loss of local control. (See discussion below.) It also points out, in a well documented portion of its brief, several factors which indicate that locally controlled education in a black community, if adequately financed, may produce better educational opportunities on the whole than forced integration. (Lawrence, *Segregation "Misunderstood": The* Milliken *Decision Revisited* (1977) 12 U.S.F.L.Rev. 15, p. 28, fn. 60, and p. 52, fns. 163 & 164, and accompanying text; Bell, *Serving Two Masters: Integration Ideals and Client Interests in School Desegregation Litigation* (1976) 85 Yale L.J. 470; Comment, *Alternative Schools* (1973) 61 Cal.L.Rev. 858; Kirp, *Community Control, Public Policy and the Limits of Law* (1970) 68 Mich.L.Rev. 1355.)

It appears to us that those considerations do not affect the fundamental concepts set forth above, but only bear on the question of what may be the best feasible remedy for established constitutional violation.

We also note at the other extreme that some commentators suggest that the courts should recognize that the very purpose of segregation as originally practiced was to officially define blacks as inferior beings, and that therefore the courts must furnish remedies which insure absolute equality for blacks whenever and however segregation raises its head. (See Lawrence, *op. cit., supra,* 12 U.S.F.L.Rev. 15.)

mandates the correction of racial imbalance between districts where feasible.

Turning to *Milliken,* we find that the majority rest their decision, like a tripod, on three legs. The principal precept was lifted from *Swann* v. *Charlotte-Mecklenburg Bd. of Ed.* (1971) 402 U.S. 1 [28 L.Ed.2d 554, 91 S.Ct. 1267], where it had been used to approve the trial court's prodding of a recalcitrant and defaulting school board. There a unanimous court had stated: "As with any equity case, the nature of the violation determines the scope of the remedy." (402 U.S. at p. 16 [28 L.Ed.2d at p. 567].) In *Milliken,* the majority considered themselves bound by the rule that only *de jure* segregation could give rise to a constitutional violation; and they found that such a violation only existed within the city district itself. (See 418 U.S. at pp. 738, 745 & 754 [41 L.Ed.2d at pp. 1087, 1091 & 1096].) From the foregoing premise it was logical to conclude that the rule from *Swann* precluded involvement in the remedy of another district in which no constitutional violation had occurred. (*Id.,* pp. 738, 744, 746, 754-757 [41 L.Ed.2d, pp. 1087, 1090, 1092, 1096-1098].)

It was acknowledged that any Detroit only segregation plan would lead directly to a single segregated Detroit school district overwhelmingly black in all of its schools, surrounded by a ring of suburbs and suburban school districts overwhelmingly white in composition in a state in which the racial composition was 87 percent white and 13 percent black. (418 U.S. at p. 739 [41 L.Ed.2d at p. 1088].) In an attempt to evade the effect of this factor, the majority again resorted to *Swann.* (See 402 U.S. at pp. 22-26 [28 L.Ed.2d at pp. 570-572].) There the court stated: "The constitutional command to desegregate schools does not mean that every school in every community must always reflect the racial composition of the school system as a whole." (402 U.S. at p. 24 [28 L.Ed.2d at p. 571]. See also *Crawford* v. *Board of Education, supra,* 17 Cal.3d 280, 303-304; and *Santa Barbara Sch. Dist.* v. *Superior Court, supra,* 13 Cal.3d 315, 330.) So, here, the majority sought to apply that rule to destroy the concept that racial imbalance itself was an evil. (418 U.S. at pp. 740-741 [41 L.Ed.2d at pp. 1088-1089].) The opinion of Marshall, J. points out, however, that the attempt to include the surrounding districts in the desegregation was not an attempt to disregard the caveat of *Swann* concerning quotas throughout all the schools. (See 418 U.S. at p. 788, fn. 1 & p. 803 [41 L.Ed.2d at pp. 1115-1116, 1124].)

The third prop of the court's opinion is its conclusion that although there may have been some state action in creating the school districts, it could not furnish the basis for interdistrict relief, unless at the time of the

establishment of the districts there was an intent or purpose to create, maintain or perpetuate segregation of races. (418 U.S. at pp. 748-752 [41 L.Ed.2d at pp. 1093-1095].) The opinion emphasizes local control of the schools. It states: "The Michigan educational structure involved in this case, in common with most States, provides for a large measure of local control, and a review of the scope and character of these local powers indicates the extent to which the interdistrict remedy approved by the two courts could disrupt and alter the structure of public education in Michigan. The metropolitan remedy would require, in effect, consolidation of 54 independent school districts historically administered as separate units into a vast new super school district." (418 U.S. at pp. 742-743, fn. omitted [41 L.Ed.2d at pp. 1089-1090].) A series of rhetorical questions poses the administrative details involved.

The four dissenting justices in three opinions reject the parochial approach of the majority and point out that the culprit in the case was the State of Michigan itself, and that there is nothing untoward in requiring the school districts, as creatures of the state, to eliminate or alleviate the segregation existing in one general metropolitan area. (418 U.S. at pp. 757-762 [41 L.Ed.2d at pp. 1098-1101], Douglas, J.; *id.,* pp. 762-780 [41 L.Ed.2d, pp. 1101-1111], White, J. with Douglas, Brennan & Marshall; *id.,* pp. 781-815 [41 L.Ed.2d, pp. 1112-1131], Marshall, J., with Douglas, Brennan & White.) The Michigan educational system is unitary, maintained and supported by the Legislature, and under the general supervision of the State Board of Education. (See 418 U.S. at pp. 758, 768-772 and 785-786 & 790-797 [41 L.Ed.2d at pp. 1099, 1104-1107 and 1114-1115 & 1117-1121].) Both Justices White and Marshall urge that the administrative difficulties can be met at the local scene by state action and are not insuperable as suggested by the majority. (418 U.S. at pp. 767-770 and 808-812 [41 L.Ed.2d at pp. 1103-1105 and 1127-1129].) As Justice White points out, parental and local concerns, when not in conflict with the Constitution, can be considered in any plan. (418 U.S. at pp. 778-779 [41 L.Ed.2d at pp. 1110-1111].) Both opinions stress that the state's control over school district boundaries and any local establishment of such boundaries is subject to alteration to redress constitutional boundaries in the same manner as voting districts were ordered revised in the reapportionment cases. (418 U.S. at pp. 777-778 and 807-808 [41 L.Ed.2d at pp. 1109-1110 and 1126-1127], adverting to *Reynolds* v. *Sims* (1964) 377 U.S. 533, 575 [12 L.Ed.2d 506, 535, 84 S.Ct. 1362]. See also *Silver* v. *Brown* (1965) 63 Cal.2d 270 [46 Cal.Rptr. 308, 405 P.2d 132].)

When these opinions are juxtaposed and compared with existing California constitutional law, we must reject respondents' contention that

the majority opinion in *Milliken* should furnish a guideline and precedent for the educational rights conferred on pupils of a minority race by the California Constitution.[17] In the first place, in this state there is a constitutional right of minority students to be free from the isolating and debilitating effects of segregation regardless of its source. (See *Crawford* v. *Board of Education, supra,* 17 Cal.3d at p. 301.) We therefore bypass Chief Justice Burger's search for and emphasis upon a single entity responsible for some de jure segregation. Furthermore it is clear that in California, as in Michigan, the responsibility for furnishing constitutionally equal educational opportunities to the youth of the state is with the state, not solely in the local entities it has created.

In *Mulkey* v. *Reitman, supra,* 64 Cal.2d 529, the court struck down, as offensive to the Fourteenth Amendment, a state constitutional amendment which purported to confer absolute discretion in the sale, leasing or renting of real property. In considering the question of state action the court, citing *Jackson* v. *Pasadena City School Dist., supra,* 59 Cal.2d 876, observed that "the state, because it had undertaken through school districts to provide educational facilities to the youth of the state, was required to do so in a manner which avoided segregation and unreasonable racial imbalance in its schools." (64 Cal.2d at p. 537. See also *Crawford* v. *Board of Education, supra,* 17 Cal.3d 280, 291; *Santa Barbara Sch. Dist.* v. *Superior Court, supra,* 13 Cal.3d 315, 328-329; and *San Francisco Unified School Dist.* v. *Johnson, supra,* 3 Cal.3d 937, 951.) In *Hall* v. *City of Taft* (1956) 47 Cal.2d 177 [302 P.2d 574], the court reviewed state constitutional provisions similar to those now extant, and concluded: "In harmony with those provisions it has been held that the power of the state Legislature over the public schools is plenary, subject only to any constitutional restrictions." (47 Cal.2d at pp. 180-181. See also *Serrano* v. *Priest, supra,* 18 Cal.3d 728, 772; *Santa Barbara Sch. Dist.* v. *Superior Court, supra,* 13 Cal.3d 315, 339-347; *Worthington S. Dist.* v.

---

[17]In addition to the basic difference in approach between federal constitutional law as exposited in *Milliken,* and California constitutional law as we have delineated it in the text of this opinion, we note that many commentators have joined in criticizing the result of *Milliken* and its progeny. (See Goldstein, *A Swann Song for Remedies: Equitable Relief in the Burger Court* (1978) 13 Harv. Civ. Rights-Civ. Lib. L.Rev. 1, 26-38; Lawrence, *op. cit., supra,* 12 U.S.F. L.Rev. 15, 15-48; Hain, *School Desegregation* (1976) 23 Wayne L.Rev. 65; Dell'Ario, *op. cit. supra,* 2 Hastings Const.L.Q. 113, 128-151.)

It also is noted that *Milliken* has had an eroding effect on efforts to relieve intradistrict segregation. (See *Pasadena City Bd. of Education* v. *Spangler, supra,* 427 U.S. 424; *Austin Independent School Dist.* v. *United States* (1976) 429 U.S. 990 [50 L.Ed.2d 603, 97 S.Ct. 517]; *Dayton Bd. of Ed.* v. *Brinkman, supra,* 433 U.S. 406; and Lawrence, *op. cit., supra,* 12 U.S.F. L.Rev. 15, 48-54. Cf. *Hills* v. *Gautreaux* (1975) 425 U.S. 284, 291-296 [47 L.Ed.2d 792, 799-803, 96 S.Ct. 1538]. Note, *Tasby* v. *Estes* (5th Cir. 1978) 572 F.2d 1010, app. granted 2/21/79.)

*Eureka S. Dist.* (1916) 173 Cal. 154, 156 [159 P. 437]; *Pass School Dist.* v. *Hollywood Dist.* (1909) 156 Cal. 416, 418 [105 P. 122]; *Bay View School Dist.* v. *Linscott* (1893) 99 Cal. 25, 27 [33 P. 781]; *Hughes* v. *Ewing* (1892) 93 Cal. 414, 417 [28 P. 1067]; *Chico Unified Sch. Dist.* v. *Board of Supervisors* (1970) 3 Cal.App.3d 852, 855 [84 Cal.Rptr. 198]; *San Carlos Sch. Dist.* v. *State Bd.° of Education, supra,* 258 Cal.App.2d 317, 324; *Mountain View Sch. Dist.* v. *City Council* (1959) 168 Cal.App.2d 89, 97 [335 P.2d 957]; and 29 Ops.Cal.Atty.Gen. 82, 83-84 (1957).)

■ The authorities last cited demonstrate that the state has the power, although it may delegate it locally, to form, dissolve, and transfer territory among school districts without the necessity of local elections. ■ That the state has a duty to intervene to prevent unconstitutional discrimination is established by the *Serrano* cases. In *Serrano I (Serrano* v. *Priest, supra,* 5 Cal.3d 584) the court concluded as follows: "The California public school financing system, as presented to us by plaintiffs' complaint supplemented by matters judicially noticed, since it deals intimately with education, obviously touches upon a fundamental interest. For the reasons we have explained in detail, this system conditions the full entitlement to such interest on wealth, classifies its recipients on the basis of their collective affluence and makes the quality of a child's education depend upon the resources of his school district and ultimately upon the pocketbook of his parents. We find that such financing system as presently constituted is not necessary to the attainment of any compelling state interest. Since it does not withstand the requisite 'strict scrutiny,' it denies to the plaintiffs and others similarly situated the equal protection of the laws. If the allegations of the complaint are sustained, the financial system must fall and the statutes comprising it must be found unconstitutional." (5 Cal.3d at pp. 614-615.) Significantly the court made the following observation, consistent with the dissenters in *Milliken*: "In the second group of cases, dealing with apportionment, the high court has held that accidents of geography and arbitrary boundary lines of local government can afford no ground for discrimination among a state's citizens. [Citations.]" After a reference to *Reynolds* v. *Sims, supra,* the opinion continues: "If a voter's address may not determine the weight to which his ballot is entitled, surely it should not determine the quality of his child's education." (*Id.,* p. 613.)[18]

[18]Cf. Burger. C. J. in *Milliken* v. *Bradley, supra*: "The dissents also seem to attach importance to the metropolitan character of Detroit and neighboring school districts. But the constitutional principles applicable in school desegregation cases cannot vary in accordance with the size or population dispersal of the particular city. county, or school district as compared with neighboring areas." (418 U.S. at p. 747. fn. 22 [41 L.Ed.2d at

Thereafter the United States Supreme Court decided *San Antonio School District* v. *Rodriguez, supra,* 411 U.S. 1, in which a divided court upheld a Texas school financing system, similar to that condemned in *Serrano I,* on the theory that although it resulted in unequal expenditures between children it rationally furthered a legitimate state purpose or interest. (411 U.S. at pp. 54-55 [36 L.Ed.2d at p. 55].) Here the high court stressed local control (*id.,* pp. 49-53 [36 L.Ed.2d pp. 52-55]), as it did later in *Milliken* (418 U.S. at pp. 741-744 [41 L.Ed.2d at pp. 1089-1091]).

In *Serrano II* (*Serrano* v. *Priest, supra,* 18 Cal.3d 728) our Supreme Court rejected the overtures of *Rodriguez* and adhered to its conclusion that education was a fundamental interest, and that there was a failure to show a compelling interest for the retention of the existing school financing system, thereby rendering it discriminatory under the provisions of the state Constitution. (*Id.,* at pp. 762-763.) The court concluded: "Article IX, section 14 of the state Constitution clearly establishes that it is the Legislature which bears the ultimate responsibility for establishing school districts and their boundaries. By its exercise of this power, and by the concurrent exercise of its powers under article XIII, section 21 to provide for a school financing mechanism based upon county levies of school district taxes, it has created a system whereby disparities in assessed valuation per ADA among the various school districts result in disparities in the educational opportunity available to the students within such districts. Thus, as we said in *Serrano I,* '[g]overnmental action drew the school district boundary lines, thus determining how much local wealth each district would contain [citations].' (5 Cal.3d at p. 603.) It is that action, which we reiterate is the product of *legislative* determinations, that we today hold to be in violation of our state provisions guaranteeing equal protection of the laws." (*Id.,* at pp. 772-773, fn. omitted.)

So here governmental action has drawn the school district lines. It is these lines which have determined the imbalance questioned in these proceedings. If, as alleged, those lines serve to create or maintain an imbalance which deprives minority groups of a right to equal educational opportunities, free from isolation and segregation, there has been a violation of our state provisions guaranteeing equal protection of the law.

---

p. 1093].) It, however, is obvious that the application of those constitutional principles to individuals will vary unless artificial boundaries, created for reasons no longer relevant and without a thought for contemporary constitutional imperatives, are disregarded. The pupil in an imbalanced school because of an assignment in accordance with a district boundary line is no less segregated than one similarly situated because of assignment in accordance with discriminatory attendance zones fixed within a district or because district lines have been unconstitutionally altered.

At the request of the court the parties submitted additional arguments and authorities on the question of whether judicial intervention would be inappropriate if alleviation of racial imbalance in the several school districts could not be achieved without electoral or legislative intervention. The petitioners have pointed out that there are several avenues which might provide relief without the necessity of any political change in district boundaries or governance. (See Ed. Code, §§ 10400-10407 [cooperative improvement programs]; § 11001 [contracts for performance of services for another school district]; § 35160 [general power to initiate and carry on any program, activity or otherwise act in any manner not prohibited by law]; §§ 35690-35707 [transfer of part (but not all) of an elementary district under certain conditions]; and §§ 46600-46616 [interdistrict attendance].) Since most of those remedies require agreement which the record reflects was not forthcoming in the past we turn to the meat of the question.

In reliance on *Kramer* v. *Union School District* (1969) 395 U.S. 621 [23 L.Ed.2d 583, 89 S.Ct. 1886], the opinion in *Milliken* v. *Bradley, supra,* noted as follows: "Since the Court has held that a resident of a school district has a fundamental right protected by the Federal Constitution to vote in a district election, it would seem incongruous to disparage the importance of the school district in a different context. [Citation.] While the district there involved was located in New York none of the facts in our possession suggest [*sic*] that the relation of school districts to the State is significantly different in New York from that in Michigan." (418 U.S. 717, 746, fn. 21 [41 L.Ed.2d 1069, 1092].) The San Mateo respondents and Ravenswood district suggest on the basis of the foregoing that judicial intervention should be withheld, at least in the absence of any show of wrongdoing by any of the districts involved. They rely on a precedent which interprets the federal de jure rule of interdistrict segregation. In *Evans* v. *Buchanan, supra,* 582 F.2d 750, the court, in reviewing the basic legal precepts to be applied, stated: "A court is not at liberty to issue orders merely because it believes they will produce a result which the court finds desirable. . . . The remedy for a constitutional violation may not be designed to eliminate arguably undesirable states of affairs caused by purely private conduct (*de facto* segregation) or by state conduct which has in it no element of racial discrimination." (*Id.,* pp. 757-758.)

■ In fact, *Evans* and other cases addressing the question of interdistrict de jure segregation make it clear that political boundaries and franchise rights must yield to the power of the courts to correct constitutional violations. (See *Milliken* v. *Bradley, supra,* 418 U.S. 717, 744 [41 L.Ed.2d 1069, 1090-1091]; *Evans* v. *Buchanan, supra,* 582 F.2d

750, 764; *Haney* v. *County Board of Education of Sevier County, Ark.* (8th Cir. 1969) 410 F.2d 920; and *United States* v. *Board of Sch. Commissioners, etc.* (S.D.Ind. 1978) 456 F.Supp. 183, 185, 188 & 190.) In the earlier *Haney* case, the court stated: "The argument that 'equal protection' rights must depend upon the majority vote has never found foothold under our form of constitutional government. Democratic government under our Constitution respects the majority will, but our forefathers had sufficient vision to ensure that even the many must give way to certain fundamental rights of the few. See, e. g., Federalist Papers, No. 10 (Madison) and No. 51 (Madison). The very origin of our Bill of Rights draws its history from this early concept. West Virginia State Bd. of Educ. v. Barnette, 319 U.S. 624, 638, 63 S.Ct. 1178, 87 L.Ed. 1628, 147 A.L.R. 674 (1943). As the Supreme Court has stated: 'A citizen's constitutional rights can hardly be infringed simply because a majority of the people choose that it be.' Lucas v. Forty-Fourth General Assembly of Colorado, 377 U.S. 713, 736-737, 84 S.Ct. 1459, 1474, 12 L.Ed.2d 632 (1964)." (410 F.2d at pp. 925-926.)

On full consideration of the renewed arguments of respondents we adhere to the view that when there is a violation of the state constitutional right to be free of de facto segregation, the state courts have the same powers they have to correct constitutional violations arising from discrimination in voting rights (*Silver* v. *Brown, supra,* 63 Cal.2d 270), and discrimination in school financing (*Serrano I* and *Serrano II, supra*). The federal precedents support the view that where there is a recognizable violation, the existence of political subdivisions should not preclude relief.

## V

In concluding, we stress that this decision arises upon the pleadings now before the court. The posture of the case is such that the sole ground for denying relief to the petitioners is the respondents' claim to rest on established school district boundaries, as barriers to the alleviation of alleged segregation in the schools of adjacent districts. Under the enlightened decisions of the Supreme Court of this state construing the California Constitution it is the existence of segregation, not its cause, which gives rise to a constitutional right to relief. The pupil who is discriminated against today because of the maintenance under state law of preexisting school district lines is as entitled to relief as the pupil who finds himself in the same position because of intradistrict assignment policies or because of the discriminatory reorganization of district lines.

We do not construe the law as requiring a state-wide district with no imbalance between any schools within the state. The allegations of this complaint reflect that the eight elementary districts involved are all encompassed in one union high school district which has in fact eliminated or alleviated segregation to the satisfaction of constitutional standards. It is not unreasonable to permit petitioners to attempt to establish that it is likewise feasible to similarly correct the alleged interdistrict segregation among the elementary schools. The geographical proximity of the Palo Alto Unified School District renders it also a fit subject for consideration in any attempt to establish such a plan.

 The respective county committees on school district reorganization point out that they are powerless to act on their own, and may only plan and make recommendations. (See generally Ed. Code, §§ 4005, 4242, 4290-4419; and note §§ 35511.5, 35541, 35694-35699, 35851-35854.) "It is elementary that mandamus issues only 'to compel the performance of an act which the law specially enjoins' (Code Civ. Proc., § 1085) and will not lie to control discretion within the area lawfully entrusted to the administrative agency (*Lindell Co.* v. *Board of Permit Appeals* (1943), 23 Cal.2d 303, 315 . . .; 16 Cal.Jur. 808-810, and cases there cited)." (*Faulkner* v. *Cal. Toll Bridge Authority* (1953) 40 Cal.2d 317, 326 [253 P.2d 659]. See also 5 Witkin, Cal. Procedure (2d ed. 1971) Extraordinary Writs, § 75, p. 3851.) Nevertheless, the courts may compel a board or tribunal to exercise its discretion and make a determination. (See *Carmona* v. *Division of Industrial Safety* (1975) 13 Cal.3d 303, 308, fn. 4 [118 Cal.Rptr. 473, 530 P.2d 161]; and 5 Witkin, *op. cit. supra,* § 76, p. 3852.) The sections of the Education Code referred to above establish that the respondent county committees are agencies of the state assigned a part in school district reorganization. Section 35511.5 requires that the county committee review any proposal to form a new elementary or high school district including all or part of the territory of existing districts. By reference to section 35512.1 (see § 35511.5, subd. (c)), the county committee must find "That the proposal and formation of the new district will not promote racial or ethnic discrimination or segregation." (§ 35512.1, subd. (e); see also § 4200, subd. (e).) Similarly in the case of a proposed transfer of a portion of an elementary district, the county committee must determine whether the proposed transfer would or would not "adversely affect racial or ethnic integration of the schools of the districts affected." (§ 35699.)[19] Sections

---

[19] Section 35700 prescribes: "The State Board of Education shall adopt guidelines which may be used by county committees in making their determination of whether a transfer of territory would adversely affect racial or ethnic integration of the schools of the districts affected." The State Board of Education has adopted rules governing "Plans

4328 and 4329 indicate when concurrence by the county committee of an adjacent county must be sought. From the foregoing we conclude that the respective committees were properly joined. (Code Civ. Proc., §§ 379 and 389, see fns. 4 and 5 above.) In fact *Milliken* v. *Bradley, supra,* suggests (418 U.S. at pp. 721-722 [41 L.Ed.2d at p. 1078]), although it did not reach the issue *(id.,* p. 752 [41 L.Ed.2d, p. 1095]), that any local agency created for the governance of schools should have a meaningful opportunity to be heard on the issues of whether cognizable segregation exists, and, if so, the propriety of the remedy proposed.

We recognize that despite the state's plenary power over the creation, organization and reorganization of school districts, the Legislature has generally provided for elections to approve the organizational structure whether proposed by petition, or by official plans and recommendations.[20] (See *San Carlos Sch. Dist.* v. *State Bd. of Education, supra,* 258 Cal.App.2d 317, 319-321; *Rowland School Dist.* v. *State Bd. of Education* (1968) 264 Cal.App.2d 589, 592-593 [70 Cal.Rptr. 504]; and *Schohr* v. *Polk* (1951) 104 Cal.App.2d 233, 234 [231 P.2d 164].) This fact is not an insuperable bar to relief in this case. The State of California and the California State Board of Education are named as respondents and have answered the petition (see part I above). The court may therefore properly consider the constitutionality of any legislation which proscribes or permits the existence of unconstitutional conditions. (See *Serrano* v. *Priest, supra,* 18 Cal.3d 728, 750-753.)

In *San Francisco Unified School Dist.* v. *Johnson, supra,* the court held it would be unconstitutional to give parents a veto power over the assignment of a pupil to a school beyond a reasonable walking distance from his home when such assignment was necessary to satisfy constitutional imperatives. (See 3 Cal.3d at pp. 937-954.) The court concluded: "Section 1009.5, if applied to pupil assignments, would in effect authorize parents, acting as state functionaries, to violate the Fourteenth Amendment. It would empower these private persons to inject the venom of racial discrimination into the veins of government. Such a statute would

to Alleviate Racial and Ethnic Segregation of Minority Students" (Cal. Admin. Code, tit. 5, pt. 1, div. 1, ch. 7 §§ 90-101). "Guidelines" issued in 1978 supplement those rules.

[20] See Education Code sections 4022-4024 (general procedural provisions); sections 4042-4043 (reorganization under jurisdiction of different counties); sections 4201, 4203, 4205 (reorganization of districts into unified district); section 4247 (proposals of master plan); sections 4373-4375 (election provisions in plans and recommendations); sections 4402, 4404-4418 (election for adopting or rejecting plans and recommendations); sections 35514-35520 (election provisions for new districts); section 35532 (election to combine districts); section 35541 (election for consolidated high school district); section 35557 (election for transfer of elementary district); sections 35702-35707 (election on transfer of portion of territory of a school district); and section 35767 (election for annexation).

be unconstitutional on its face." (*Id.,* p. 954.) In *Serrano II, supra,* 18 Cal.3d 728, the court held that the Legislature's interest in local control of fiscal and educational matters was not such a compelling state interest under the equal protection clause of the California Constitution as to warrant a system which deprived pupils in districts with a lesser taxable wealth per pupil of an equal educational opportunity. The court pointed out: "Thus, as we said in *Serrano I,* '[g]overnmental action drew the school district boundary lines, thus determining how much local wealth each district would contain [citations].' (5 Cal.3d at p. 603.) It is that action, which we reiterate is the product of *legislative* determinations, that we today hold to be in violation of our state provisions guaranteeing equal protection of the laws." (18 Cal.3d at pp. 772-773, fn. omitted.) If, as we have indicated, the state authorities are under a constitutional mandate to alleviate segregation occasioned by the maintenance of arbitrary school district boundaries, neither the Legislature, nor the electorate, under power delegated by the Legislature, may thwart the granting of relief to those who have been deprived of an equal educational opportunity.

We caution, however, that if there is cause to take remedial action, such action must focus on providing equal educational opportunity for the minority race. It would be idle to furnish absolute vindication of equal opportunity through the elimination of all racial and ethnic imbalance, only to create an environment which lessened the educational opportunities for those whose constitutional rights we protect. Experience in other communities had raised questions concerning the techniques to be used to remedy segregation (see fn. 16 above.) Although rancor and prejudice cannot be given official sanction through the ballot box, the effect of a hostile environment on the education of those exposed to it is a consideration which should not be overlooked.

The judgment of the lower court must be reversed, with leave to petitioners to amend as suggested above (parts II and IV) to the end that after answers are filed the court can determine the issues last set forth above.

In considering whether there is interdistrict segregation, and, as well, if it finds it does exist, in approving a remedy, the trial court must be guided by established principles. ▮ The provisions of former section 1009.5 of the Education Code have been continued in sections 35350 and 72209. The provisions, "No governing board of a school district shall require any student or pupil to be transported for any purpose or for any reason without the written permission of the parent or guardian," have been

authoritatively construed "to avoid any limitation on the authority of school boards in the assignment of pupils to their respective schools" and only limit "the power of school districts to compel students to utilize any particular mode of transportation without parental consent." (*San Francisco Unified School Dist.* v. *Johnson, supra,* 3 Cal.3d 937, 960.)

Section 35351 provides: "No public school student shall, because of his race, creed, or color, be assigned to or be required to attend a particular school." (See also § 72210.) This echoes former section 1009.6. Those provisions, as contained in an initiative measure, were held to be unconstitutional in *Santa Barbara Sch. Dist.* v. *Superior Court, supra,* 13 Cal.3d 315 (see pp. 322-328). At the same time, however, the court upheld so much of the initiative measure as repealed sections of the Education Code (former §§ 5002 & 5003) which directed school districts to "eliminate racial and ethnic imbalance in pupil enrollment," and specified certain factors to be considered in developing plans to achieve racial balance, and, as well, repealed administrative guidelines which had been adopted to implement those sections. In so ruling the court stated: "[S]ince racial balance determined according to a precise statutory formula is not a constitutional prerequisite but a matter of state policy, the people of California through the initiative process, have the power to declare state policy. The repealing provisions of Proposition 21 can conceivably be interpreted as an expression by the people of this state of their preference for a 'neighborhood school policy.' (See *Keyes* v. *School Dist. No. 1, Denver, Colo., supra,* 413 U.S. at p. 206 [37 L.Ed.2d at p. 562].) We deem it unnecessary to the resolution of the issues now before us to determine precisely what was the intention of the electorate in this respect and accordingly intimate no views on the subject. We merely conclude that since a policy in favor of neighborhood schools is a reasonably conceivable one and since such an expression of policy can in no way limit or affect the constitutional obligations of school districts, the repealing provisions found in sections 2, 3 and 4 cannot be struck down as constitutionally impermissible." (13 Cal.3d at p. 330.)

The foregoing concept echoes *Jackson* v. *Pasadena City School Dist., supra,* where the court observed: "School authorities, of course, are not required to attain an exact apportionment of Negroes among the schools, and consideration must be given to the various factors in each case, including the practical necessities of governmental operation. For example, consideration should be given, on the one hand, to the degree of racial imbalance in the particular school and the extent to which it affects the opportunity for education and, on the other hand, to such matters as the difficulty and effectiveness of revising school boundaries so as to

eliminate segregation and the availability of other facilities to which students can be transferred." (59 Cal.2d at p. 882.)[21]

Finally we note that in *Crawford* v. *Board of Education, supra,* the court struck down definitions predicated upon specific percentages and a command to have racial balance in each school. (17 Cal.3d at pp. 302, fn. 12 & 310.) The court reviewed the legal principles governing such requirements and concluded: "In sum, from a constitutional standpoint, we see nothing inherently invalid in the fact that percentages of various racial or ethnic groups may vary, even significantly, in different schools throughout a school district, or even that a particular minority group may be completely unrepresented in a particular school. On the other hand, if the minority enrollment in a school is so disproportionate as realistically to isolate minority students from other students in the district, a finding of unconstitutional segregation will generally be proper." (*Id.,* p. 304. See also *National Assn. for Advancement of Colored People* v. *San Bernardino City Unified Sch. Dist., supra,* 17 Cal.3d 311, 325-326.) We conclude that the foregoing and other criteria referred to in *Crawford* for evaluating the need for, and the provisions of, any intradistrict remedial plan, should be considered in determining the existence of proscribed segregation, and if found, the remedies to be applied on an interdistrict scale.

The judgment is reversed and the case is remanded with leave to petitioners to serve and file, within 30 days after this decision is final, an amended petition, substituting or adding the involved children as petitioners, and deleting the evidentiary matter the subject of the special demurrer upheld by the trial court. Each party shall bear its own costs on appeal.

Racanelli, P. J., and Elkington, J., concurred.

A petition for a rehearing was denied May 8, 1979, and the petitions of the defendant and appellant and the defendants and respondents for a hearing by the Supreme Court were denied June 7, 1979.

---

[21]The foregoing quotation must be read in the light of the paragraph preceding it, which reads in part as follows: "So long as large numbers of Negroes live in segregated areas, school authorities will be confronted with difficult problems in providing Negro children with the kind of education they are entitled to have. Residential segregation is in itself an evil which tends to frustrate the youth in the area and to cause antisocial attitudes and behavior. Where such segregation exists it is not enough for a school board to refrain from affirmative discriminatory conduct. The harmful influence on the children will be reflected and intensified in the classroom if school attendance is determined on a geographic basis without corrective measures. The right to an equal opportunity for education and the harmful consequences of segregation require that school boards take steps, insofar as reasonably feasible, to alleviate racial imbalance in schools regardless of its cause." (59 Cal.2d at p. 881.)